Russ MORTON and Glenda M. Morton *v.* PARK VIEW
APARTMENTS, an Arkansas Limited Partnership,
Warren Theis, Individually, and Joanne S. Smith, Individually

92-808                                              868 S.W.2d 448

Supreme Court of Arkansas
Opinion delivered December 20, 1993
[Rehearing denied January 24, 1994.*]

---

*Glaze and Brown, JJ, not participating.

*Barrett, Wheatley, Smith & Deacon*, by: *Tom D. Womack* and *D. P. Marshall, Jr.* and *Eilbott Law Firm*, by: *Don Eilbott*, for appellants.

*Arnold, Grobmyer & Haley*, by: *Robert R. Ross*, for appellees.

DONALD L. CORBIN, Justice. Appellants, Glenda and Russ Morton, appeal a judgment of the Jefferson Chancery Court rendering moot their claim for foreclosure of a vendor's lien, granting reformation of a contract, and dismissing their claim for damages due to a failure of proof. On appeal, the Mortons challenge the rulings on damages and reformation. We reverse and remand the judgment as to damages; otherwise we affirm the judgment as entered by the chancellor.

## I. BACKGROUND FACTS AND PROCEDURAL HISTORY

In 1978, the Mortons sold Park View Apartments to appellees Joanne Smith and Warren Theis by means of a contract of sale and an installment note for $230,000.00. The contract and the note specified that the obligation of Smith and Theis was without recourse but that the debt was secured by the property. Further, the contract provided that Smith and Theis

could request a deed on the property at any time in return for a vendor's lien.

The property in question consists of a large two-story apartment building located in Pine Bluff, Arkansas, that was built in the 1920's and was previously owned by Mrs. Morton's parents. Upon moving out of state, the Mortons desired to sell the property and eliminate the need for long distance management. Smith and Theis were real estate investors who located investment properties, syndicated them to other investors, and then managed the properties. Smith and Theis, as general partners, formed a limited partnership of investors and used the Park View Apartments and the partnership to take advantage of federal income tax benefits. The limited partnership was named the Park View Apartments (the Partnership).

With changes in the tax code in 1986, the property no longer provided its previous investment benefits, so Smith sought funding to improve the investment value of the property. Funds for rehabilitation were sought from the Department of Housing and Urban Development (HUD), and the property was placed on the national historic registry. Because HUD required prospective borrowers to have title in the property in order to qualify for funding, Smith and Theis exercised their option under the 1978 sales contract with the Mortons, and in 1988, requested a deed. Accordingly, their attorney drew up an installment note reflecting the unpaid balance of $205,070.53, and a special warranty deed which retained the vendor's lien and the buyers' responsibility to insure the property.

None of the terms of the 1988 transaction were negotiated and all parties signed the documents. In the event the property had to be returned to the Mortons, the special deed provided that the property was to be returned "in as good condition as when delivered, normal wear and tear and damage caused by fire, windstorm or casualty excepted." Unlike the documents in the 1978 transaction, neither the deed nor the note in this 1988 transaction provided that this was a non-recourse transaction. The Mortons had an attorney available to them during the transactions in both 1978 and 1988, but, by their own admission, failed to utilize those services completely.

In the spring of 1989, a hailstorm damaged the roof of Park

View. While water buckets, plastic window shades, and plastic sheeting were used to catch the water, no significant repairs were made.

Before making funds available for the rehabilitation project, HUD required the Partnership to invest $200,000.00 of its own money. The Partnership was not willing to invest the $200,000.00, thus Smith and Theis were unable to secure adequate funds from HUD for the renovation project. Smith testified on direct examination that "[i]n June of 1989 we gave up trying to take care of the property after we could not get adequate financing or sell it to other people", and in July 1989, Smith, Theis and the Partnership defaulted on the note. Smith offered to return the complex to the Mortons without foreclosure, or to take the Mortons in as partners in the rehabilitation project in return for their investment. The Mortons declined both offers.

In late August or early September of 1989, Smith and Theis filed an insurance claim on the hail damage and settled with the insurance company for $9,064.43. In September 1989, Smith and Theis offered the deed and insurance proceeds to the Mortons; the offer was again refused.

In October 1989, the Mortons filed to foreclose on their vendor's lien and to hold Smith and Theis personally liable on the 1988 note. The Mortons also sued the Partnership. Smith and Theis answered, offering possession of the property to the Mortons, and denied intent of the parties to allow recourse under the 1988 deed or note; they further counterclaimed for reformation of the 1988 documents so those documents would reflect the non-recourse provision contained in the earlier 1978 documents.

In December 1989, during the pendency of the foreclosure suit, freezing temperatures caused the water pipes in Park View to freeze and burst. While Smith and Theis capped leaking water lines and relocated affected tenants, they made no repairs. Smith filed an insurance claim for these damages resulting from the freeze. Smith asked for $10,064.43 from the insurance company, but the company paid only $4,000.00. The Mortons then amended their complaint to seek damages alleging waste, breach of contract, and negligence against Smith, Theis, and the Partnership for failing to maintain and repair Park View.

In December of 1991, the chancellor held there was a mutual mistake regarding the omission of the non-recourse provision from the 1988 deed and note, and reformed the deed to include the omitted provision. Title to the property was vested in the Mortons along with the insurance proceeds from both casualties ($13,064.43 total). Since the hailstorm and frozen pipe events were casualties and as such excepted under the terms of the deed, the chancellor found that Smith, Theis, and the Partnership were not legally responsible for the damages directly attributable to those two events. However, he did find the Partnership liable for the damages due to untimely repairs. Nonetheless, because he found the Mortons' proof went only to the total costs of repairs without apportioning which damages were attributable to the hailstorm and freeze as opposed to those resulting from Smith's and Theis' negligence, the chancellor denied the Mortons' request for damages. The chancellor stated that any attempt on his part to apportion damages would be speculative, so he dismissed the Mortons' amended complaint. The Mortons appeal from that order.

## II. DAMAGES

On appeal, the Mortons claim they are entitled to $48,289.60. They contend this figure represents the difference between the value of the property as they should have received it from the defaulting buyers and the value of the property as received by them in its state of disrepair. Appellees respond with the argument that it is the Mortons' burden to prove their damages, that the only evidence presented at trial was in relation to a claim for over $100,000.00, and that the Mortons are raising the claim for $48,289.60 for the first time on appeal.

In finding the Mortons' proof was inadequate to establish with any degree of certainty the portion of damages caused by Smith and Theis, the trial court held the applicable measure of damages was the reasonable expense of necessary repairs to the property. *See* AMI 3d 2213. No one questions that standard in this appeal. In his detailed letter opinion, the chancellor made slight reference to normal wear and tear of the building as being a consideration when determining damages. But he later correctly stated the measure of damages for the temporary or repairable injury to real property. Normal wear and tear is not an element of the cost-of-repairs measure applied in these circumstances.

In applying this cost-of-repair standard, the trial court found that the proof offered bore only to the cost of repairing the entire complex and that Smith and Theis were not responsible for all damages since a large portion of the damages were caused by the hailstorm in April of 1989, and rains falling on the damaged roof afterwards. The trial court was clearly wrong in this finding.

The Mortons offered expert testimony concerning the total cost of repair to restore the Park View building without attempting to apportion the amount to what or who caused the damage. This total was $101,159.00. However, among other evidence before the trial court were estimates submitted by insurance adjusters fixing the hail damage to the Park View Apartments in the amount of $14,434.97 ($8,040.00 for roof repairs and $6,394.97 for interior repairs). A roofing company estimated it would repair the building roof for $11,424.10. In addition, the parties introduced an estimate totalling $10,593.80 to repair the damages occurring in December 1989 from the frozen pipes. These items of evidence clearly were available to the trial court to apportion or fix the damages that resulted from the two casualties that occurred. The Mortons' expert witness offered further testimony useful in apportioning the total repair costs; he estimated that 40% to 50% of the damage to the roof was caused by the hailstorm. The Mortons' expert also stated that the rotting of the lumber underneath the roof, fascia, and around the windows was caused by the failure to repair and properly maintain the property.

We appreciate the trial court's expressed concern to obtain an exact or certain damage figure that it could clearly apportion to the casualties involved and to the fault attributable to Smith and Theis. Nonetheless, Mortons' recovery will not be denied merely because the damages are difficult to ascertain. *Taylor* v. *Green Memorial Baptist Church*, 5 Ark. App. 101, 633 S.W.2d 48 (1982). As we said recently in *Dr. Pepper Bottling Co.* v. *Frantz*, 311 Ark. 136, 842 S.W.2d 37 (1992), this court has not insisted on exactness of proof in determining damages, and if it is reasonably certain that some loss has occurred, it is enough that damages can be stated only approximately. *See Jim Halsey Co.* v. *Bonar*, 284 Ark. 461, 683 S.W.2d 898 (1985).

The Mortons' claim for $48,289.60 is not an argument raised for the first time on appeal, but an attempt to ascertain the specific

amount of damages proved at trial. The Mortons arrive at the $48,289.60 by subtracting $30,869.40 (the amount of damage caused by the two casualties) and $22,000.00 (the depreciation of the property as measured by the estimate for exterior paint and repairs) from $101,159.00 (the estimate for total repairs to the property).

■■ We review chancery cases *de novo. Janssen* v. *McKimmey*, 305 Ark. 360, 807 S.W.2d 920 (1991). The evidence supports the Mortons' ascertainment of damages, except for the figure of $30,869.40. The Mortons contend this figure is the sum of repairs caused by the two casualties: $8,040.00 for interior repairs (insurance adjustor's figure from hail damage) + $11,424.10 for roof damage (private company's estimate from hail damage) + $11,405.30 for damage caused by frozen water pipes. The insurance company's estimate for interior repairs was $6,394.97, not $8,040.00. Thus, the amount of damages proved as a result of the two casualties was only $29,224.37, not $30,869.40. Therefore, the findings and conclusions that the Mortons are entitled to damages are affirmed and modified to reflect their damages were proved in the amount of $49,934.63.

### III. REFORMATION

The Mortons' second point on appeal is that the chancellor erred in reforming the 1988 documents. They allege the omission of the non-recourse provision was not a mutual mistake as the chancellor found but a unilateral mistake, and thus no reformation was justified. The Mortons actually urge that a couple of unilateral mistakes occurred, the first of which occurred in the 1978 documents with the inclusion of the non-recourse provision since it was their intent to be able to hold Smith and Theis personally liable under the contract. Further, they argue that the second unilateral mistake was Smith's and Theis' when the provision was omitted from the 1988 documents.

■ Courts of equity have the authority to reform deeds when the evidence is clear, convincing, and decisive that there is either a mutual mistake in the drafting of the instrument or a unilateral mistake accompanied by inequitable conduct by the other party. *Falls* v. *Utley*, 281 Ark. 481, 665 S.W.2d 862 (1984); *Bonner* v. *Sikes*, 20 Ark. App. 209, 727 S.W.2d 144 (1987). Parol evidence is admissible to show mutual mistake. *Garot* v. *Hopkins &*

*Coats*, 266 Ark. 243, 583 S.W.2d 54 (1979).

Both parties signed and validated the 1978 non-recourse provision, and also agreed that, if Smith and Theis asked, the Mortons would execute a warranty deed with a retained lien covering the then unpaid balance. The parties made no provision indicating that their individual liability would change if a warranty deed later ensued. In an effort to obtain the HUD financing for renovation, Smith and Theis exercised their right to request the warranty deed. The 1988 documents were the result of that request. Thus, the 1988 documents were not a separate and subsequent transaction but a continuation of the 1978 agreement. Any terms included in the 1978 documents should therefore have been included in the 1988 documents. Any terms excluded from the 1988 documents were the result of a mutual mistake.

The parties testified that no additional negotiations were conducted prior to the drafting and signing of the special warranty deed and note in 1988. Additionally, Mr. Morton testified that he did not question the attorney who drafted the instruments about any of the provisions. Smith's and Theis' attorney, Mr. Harley Cox, Jr., testified that he was directed to track the 1978 documents and that the omission of the non-recourse provision from the 1988 documents was an oversight on his part. The record reflects the Mortons, Smith and Theis were unaware of this material omission when they signed the new documents.

Although Mr. Morton testified that he did not understand the non-recourse provision, he was represented by counsel when he signed the 1978 agreement. The 1978 agreement was intended as a device to facilitate the establishment of a limited partnership for the purpose of taking favorable federal income tax deductions. Mr. Cox testified that, under the tax code, in order for the limited partners to take advantage of the favorable deductions, Smith and Theis, as general partners, could not be personally liable for the debt. Thus, all the parties to the 1978 agreement intended for the debt to be non-recourse. That the non-recourse provision was not included in the 1988 documents was due to mutual mistake. Concerning the 1988 documents, Mr. Morton merely stated he signed them without reading them.

In sum, the evidence supports the chancellor's finding

that there was mutual mistake in omitting the non-recourse provision from the 1988 instruments. Thus, the reformation to allow non-recourse to Smith and Theis for liability in foreclosure should be affirmed. We emphasize that, while our holding today renders Smith and Theis free from personal liability on the debt foreclosed, Smith and Theis remain personally liable for the damages they caused to the property.

The judgment is affirmed as modified herein.

Special Justices C.C. Gibson, III and Peter G. Kumpe join in this opinion.

DUDLEY and NEWBERN, JJ., dissent.

GLAZE and BROWN, JJ., not participating.

DAVID NEWBERN, Justice, dissenting. In spite of its seeming recognition that evidence to reform a deed must be clear, convincing, and decisive that there has been either a mutual mistake or a unilateral mistake accompanied by inequitable conduct by the other party, the Court's opinion ignores the law. It holds that the evidence supports the chancellor's finding that there was a mutual mistake in omitting the non-recourse provision from the 1988 instruments and upholds the reformation. There is no evidence which supports that conclusion or indeed any conclusion that the Morton's ever intended this to be a non-recourse transaction. The testimony adduced at trial reveals that the Morton's were unaware of the meaning of the non-recourse language in the 1978 documents but that they both intended Theis and Smith to be personally liable for the obligation. While this may have supported reformation of the 1978 agreement it has nothing to do with the 1988 contract.

The attorney preparing the 1988 documents testified that the omission of the language was an oversight on his part, but such an occurrence presents no evidence of mistake on the part of the Mortons. Both parties in these transactions were represented by counsel at all times in the drafting of these documents, and at most we are presented with a unilateral mistake on the part of Theis and Smith in the signing of the 1988 agreement. There is no evidence of inequitable conduct by the Morton's which would support a reformation based on unilateral mistake, and the chancellor correctly rejected that as a basis for reformation.

The Court's reasoning that Mr. Morton's signing the 1988 document without reading it suggests unconcern with the provisions of the agreement is much more applicable to Theis and Smith, the parties who were in the business of putting together tax deals like this one and who were obviously their limited partners' motivating experts in these circumstances. I take particular exception to the Court's statement that, because Theis and Smith intended to get tax benefits for their limited partners and thus they could not be liable as general partners for the debt, "Thus all the parties to the 1978 agreement intended for the debt to be non-recourse. That the non-recourse provision was not included in the 1988 documents was due to mutual mistake." That is an exercise in illogic.

While the absence of negotiation concerning the 1988 agreement and the oversight by the lawyer may have resulted in a mistake, it was clearly not a mutual mistake as contemplated by our cases regarding reformation. To affirm the chancellor creates a bald fiction unsupported by any evidence whatever.

I respectfully dissent.

DUDLEY, J., joins in this dissent.