Joe and Margaret WHISENHUNT *v.*
FIRST STATE BANK OF CONWAY

CA 02-115                                        90 S.W.3d 438

Court of Appeals of Arkansas
Division I
Opinion delivered November 6, 2002

[Petition for rehearing denied December 11, 2002.]

*Dover Dixon Horne PLLC*, by: *Darrell D. Dover*; and *Couch O'Quinn PLLC*, by: *David A. Couch*, for appellants.

*Brazil, Adlong & Winningham, PLC*, by: *William Clay Brazil*, for appellee.

*Quattlebaum, Grooms, Tull & Burrow PLLC*, by: *Timothy W. Grooms, Leon Holmes*, and *Kristine G. Baker*, for *amicus curiae* Arkansas Realtors Ass'n.

TERRY CRABTREE, Judge. Appellants Joe and Margaret Whisenhunt appeal from the trial court's reformation of a deed. The deed reflected a 1999 transaction in which appellants sold a commercial lot in Conway to John Allison and Robert Adcock. Allison and Adcock in turn sold the lot to appellee First State Bank. In 2001, the Bank asked the trial court to reform the deed to extend the lot's border a few feet westward. That relief was granted by the trial court. We reverse and remand for the reasons explained hereafter.

In 1995, appellants purchased 13.5 acres of commercial property in Conway for use as a shopping center. The tract is bound on the north by Prince Street and on the east by Salem Road. It is irregularly shaped and can best be described by including a small

adjacent "out-parcel" not purchased by appellants. With that parcel, the property is rectangular in shape. The longer sides on the east and west measure approximately 1,313 feet, and the shorter northern and southern sides measure 494 and 496 feet respectively. The out-parcel is a 240-foot by 260-foot lot on the northeast corner of the rectangle, occupied by Regions Bank. Except for that parcel, appellants owned the remainder of the rectangle.

Appellants divided the 13.5 acres into four lots. The lots were designated as Lot 1 (measuring 10.19 acres) and Lots 2, 3, and 4 (which were smaller). They would eventually sell Lots 2, 3, and 4, but they retained Lot 1 for themselves. Lot 1 contained a Kroger store at the south end of the tract (facing northward), the Kroger parking lot, and all other property lying outside Lots 2, 3, and 4.

Lot 2, situated on the northwest corner of the tract (directly west of Regions Bank) is occupied by First Community Bank. Between it and the Regions Bank lot on the northeast corner, a paved roadway turns south into the shopping center from Prince Street. The roadway, called Kroger Drive, runs south for a short distance, then runs slightly southeast toward the Kroger store and parking lot at the southern end of the tract.

Lot 3 (later designated Lot 3R) is situated directly south of the Regions Bank parcel. It is occupied by appellee First State Bank. Lot 4 (later designated Lot 4R) is located south of Lot 3R and is occupied by a car wash. As Kroger Drive makes its way south from Prince Street, it runs close to, but not right up against, the western borders of Lots 3R and 4R. The area between Kroger Drive and the western borders of Lots 3R and 4R is owned by appellants and contains landscaped islands. It was standard practice for appellants to place landscape buffers on the edges of their retained property in order to control their grantees' access to drives.

In the summer of 1998, John Allison and Robert Adcock met with appellants' son, Joe Whisenhunt, Jr., who handled all of appellants' dealings in this matter, and informed him that they were interested in Lot 3R as a location for a branch of First State

Bank.[1] From observing the lot, Allison and Adcock were under the mistaken impression that the western border of Lot 3R extended all the way to Kroger Drive; they did not realize that the lot stopped several feet short of Kroger Drive. Their mistake was reinforced when, during the meeting with Whisenhunt, the three discussed ingress and egress onto the drive from Lot 3R and curb cuts leading from the lot onto Kroger Drive. Despite these discussions, Whisenhunt did not mention to Allison and Adcock that the lot did not extend to Kroger Drive.

Following the meeting, Allison and Adcock agreed to purchase the lot for $465,000. A deed was executed, describing the property as follows:

> LOT 3R OF THE REPLAT OF LOTS 3 & 4, PRINCE/SALEM SUBDIVISION TO THE CITY OF CONWAY, FAULKNER COUNTY, ARKANSAS, CONTAINING 1.13 ACRES, MORE OR LESS, AS SHOWN IN THE REAL ESTATE RECORDS OF FAULKNER COUNTY, ARKANSAS, IN PLAT BOOK "J", PAGE 69; SUBJECT TO ALL RIGHTS OF WAY, EASEMENTS, RESERVATIONS, COVENANTS AND RESTRICTIONS THAT ARE OF RECORD.

A few weeks after closing, Allison obtained a survey that revealed an "asphalt drive" as running along the same contours as Lot 3R's western border, but eight to ten feet west of it. The record does not reveal whether Adcock and Allison failed to look at the survey or looked at it and noticed nothing untoward, but, in any event, they proceeded to construct a building on the lot while laboring under the impression that the lot extended all the way to the "asphalt drive," *i.e.*, Kroger Drive. Construction was completed in late 1999 and included at least one curb cut leading from Lot 3R onto Kroger Drive.

At some point after construction was completed, Allison and Adcock sold the lot to appellee First State Bank. The deeds were executed in May 2001, although there was some testimony that the sale was actually made in early 2000.

---

[1] Allison and Adcock were instrumental in acquiring the bank's charter and later became executive officers of the bank.

On January 19, 2001, long after construction of the bank was completed, appellants sued appellee, asking the court to enjoin appellee from using an access over appellants' property to reach Kroger Drive, referring to appellee's curb cut that crossed the eight-to-ten-foot strip between Lot 3R and Kroger Drive. Appellee counterclaimed for reformation of the deed on the basis that appellants had fraudulently represented that Lot 3R extended to Kroger Drive. Following a trial, the circuit judge ruled in appellee's favor and made the following findings: 1) the basis of the parties' bargain was that Lot 3R extended from Salem Road on the east to Kroger Drive on the west; 2) curb cuts were discussed at the parties' meeting and access to Kroger Drive was discussed; 3) Whisenhunt did not protest when, during the construction process, he saw the curb cuts being made onto Kroger Drive; 4) Allison and Adcock detrimentally relied on representations that they could have a curb cut onto Kroger Drive. Based on these findings, the judge reformed the deed as requested by appellee.[2]

Reformation proceeds on the theory that a contract was made but was not correctly reflected on the written instrument. *See Yeargan v. Bank of Montgomery County*, 268 Ark. 752, 595 S.W.2d 704 (Ark. App. 1980). It is a remedy in which the trial court revises the terms of a written instrument to reflect the intent of the parties. *Roberson Enters., Inc. v. Miller Land & Lumber Co.*, 287 Ark. 422, 700 S.W.2d 57 (1985). Reformation requires clear, convincing, and decisive proof of either mutual mistake or unilateral mistake accompanied by inequitable conduct. *Morton v. Park View Apartments*, 315 Ark. 400, 868 S.W.2d 448 (1993). On appeal, we must determine whether the trial court's finding that

---

[2] The trial judge did not mention reformation in his ruling. We have considered the possibility that he intended to merely grant appellee some type of easement over the disputed strip or some other equitable remedy instead of reforming the deed to reflect appellee's ownership of the strip. Indeed, this case does not seem well-suited to a reformation theory. However, when the judge was asked by appellee's counsel at the end of the trial if he was granting appellee's counterclaim to reform the deed, the judge responded that he was. In light of that statement, and based on the parties' characterization of this case as a reformation case, we will conduct our review accordingly.

clear and convincing evidence existed is clearly erroneous. *See Lambert v. Quinn,* 32 Ark. App. 184, 798 S.W.2d 448 (1990).

■ ■ Appellee's suit for reformation was not premised on mutual mistake but on unilateral mistake accompanied by appellants' inequitable conduct. Appellants advance numerous reasons why appellee is not entitled to reformation, one of them being that appellee was not a party to the original deed but was a subsequent grantee with knowledge of the true facts. We agree with appellants' argument on this point.

Generally, reformation may be had not only by the original parties to the instrument, but also by a party claiming privity with a party to the instrument, such as a grantee. 66 AM. JUR. 2D *Reformation of Instruments* § 59 (2d ed. 2001). This court has recognized that a successor-in-interest may pursue reformation of a deed. *See Johnston v. Sorrels,* 21 Ark. App. 87, 729 S.W.2d 21 (1987).[3] It is apparent then that appellee's status as a subsequent grantee does not, standing alone, bar its action for reformation. However, in addition to establishing a subsequent grantee's right to pursue reformation, *Johnson* set out certain requirements that a grantee must meet in order to achieve that remedy:

> [I]f the party seeking reformation was not a party to the instrument sought to be reformed, he must be able to introduce additional evidence raising a question of fact as to whether he was simply ignorant of the former mistake and intended to buy the property as described or whether he had assumed, for example, that the particular piece of land was described when in fact it was not.
>
> These requirements having been met, the fact finder must then determine whether as between each successive party there has been such a mutual mistake or mistake by one and inequitable conduct by another as would actually warrant reformation under the facts of the case.

*Id.* at 93, 729 S.W.2d at 24.

---

[3] Although *Johnston* involved reformation for mutual mistake, language in the opinion indicates that its holding applies equally in cases of unilateral mistake accompanied by inequitable conduct.

■ Appellee was not ignorant of the true boundaries of Lot 3R when it acquired ownership of it. When it took title to what the deed called "Lot 3R," appellee knew or should have known exactly what that language described: a lot whose western border stopped short of Kroger Drive. The deeds vesting title in appellee were executed in May 2001, approximately five months after appellants filed this lawsuit asserting ownership of the disputed strip. Further, there had been in existence since October of 1998 a survey showing Lot 3R's true boundary in relation to Kroger Drive. Appellee, therefore, was not or should not have been ignorant of the true dimensions of Lot 3R. It follows that it would be illogical to say that appellee was entitled to reform the deed on the basis of a mistake, knowing the true facts as it did.

■ Appellee urges us to consider the holding in *Anderson v. Weise*, 95 Nev. 540, 598 P.2d 1144 (1979), in which grantees who consummated a land sale knowing that their predecessor's deed contained a mistake were not barred from seeking reformation. First of all, we are not bound to follow the Nevada court's decision. Secondly, the grantees' pursuit of reformation in *Anderson v. Weise* was deemed reasonable because they were close friends with the original vendor and assumed that he would correct the mistake. By contrast, appellee knew or should have known in this case that appellants had no intention of correcting whatever erroneous description the deed might contain.

■ In light of the foregoing, we hold that appellee was not eligible to pursue reformation of the deed. This holding makes it unnecessary for us to address the remaining issues presented by appellant. We therefore reverse and remand the case for entry of an order consistent with this opinion.

Reversed and remanded.

JENNINGS and BIRD, JJ., agree.