MOUNTAIN PURE, LLC *v.*
AFFILIATED FOODS SOUTHWEST, INC.,
Turner Holdings, LLC, Portola Packing, Inc., Stone Container Corporation, and Consolidated Container Company, LLC

CA 05-837                                              241 S.W.3d 774

Court of Appeals of Arkansas
Opinion delivered October 25, 2006

[Rehearing denied November 29, 2006.]

*Dudley & Compton*, by: *Timothy O. Dudley; Barrett & Deacon, A Professional Association*, by: *D.P. Marshall Jr.*, and *Brandon J. Harrison*, for appellant.

*Dover Dixon Horne, PLLC*, by: *Steve L. Riggs* and *Nona M. Morris; Friday Eldredge, & Clark, LLP*, by: *William A. Waddell, Jr.*, for appellee Affiliated Foods.

LARRY D. VAUGHT, Judge. This is a contract case. Appellant Mountain Pure L.L.C. sued Affiliated Foods Southwest Inc. for breach of a supply agreement. Mountain Pure also sued

vendors Turner Holdings L.L.C., Portola Packaging Inc., Stone Container Corp., and Consolidated Container Co. L.L.C. for selling defective jugs, caps, and cartons that Mountain Pure used in its commercial water and juice bottling business.[1] The vendors counterclaimed against Mountain Pure for open-account debt. The trial court granted summary judgment to Affiliated and to the vendors. We reverse and remand for trial.

In January 2000, Mountain Pure's predecessor in interest, Dairy Farms of America Inc., purchased Mountain Pure from Affiliated. The sale was tied to a tandem, long-term supply agreement. For eight years, Affiliated was obligated to buy water and juice products from Mountain Pure in the same amounts — subject to agreed adjustments — that it had been buying prior to the sale. As an essential condition of the sale, Mountain Pure would serve as Affiliated's "primary supplier of water and juice products," until January 2008.

In the spring of 2001, the parties' relationship became strained due to problems with leaky jugs, leaking caps, and collapsing cartons. For several months Affiliated and Mountain Pure worked together in an attempt to resolve the problems. However, on July 2, 2001, Affiliated notified Mountain Pure by letter that it would begin buying water and juice from other suppliers because the leakage problems had not been corrected to Affiliated's satisfaction.

In a letter dated July 9, 2001, Mountain Pure outlined the corrective measures it had undertaken in an attempt to satisfy Affiliated. It also stated that it was committed to resolving any future problems encountered by Affiliated. Mountain Pure also reminded Affiliated that the supply agreement was a critical portion of the plant-purchase agreement.

Affiliated never resumed major purchases from Mountain Pure. In response, Mountain Pure sued Affiliated, alleging breach of the supply agreement. Mountain Pure claimed that it had cured the leakage problems but that Affiliated refused to honor the supply agreement. Mountain Pure also sued the vendors — Turner, Portola, Stone, and Consolidated — from which it bought

---

[1] Portola Packaging and Mountain Pure, by joint motion, asked us to dismiss the appeal as it relates to Portola following a settlement agreement by the parties. We granted the motion on September 20, 2006. A similar motion was filed on October 9, 2006, asking that the appeal against Turner be dismissed. We now also grant this motion.

jugs, caps, and containers for breach of contract and breach of warranties. Each vendor filed a counterclaim for debt against Mountain Pure for unpaid bills.

The parties' labyrinth of claims and counterclaims have produced a Gordian knot[2] of epic proportion. Because we have once before outlined "the long and convoluted procedural history" of the case, we will now discuss only the procedural elements essential to this second appeal. *See Mountain Pure, L.L.C. v. Affiliated Foods Southwest, Inc.*, 366 Ark. 62, 63, 233 S.W.3d 609, 610 (2006) (quoting full outline of case's procedural history contained in an unpublished opinion of the Arkansas Court of Appeals).

After the parties conducted discovery, Affiliated and the vendors made a series of summary-judgment motions. The circuit court granted Affiliated summary judgment on Mountain Pure's claim for breach of the supply agreement. The court concluded that no genuine issues of material fact existed and held that Mountain Pure had repudiated the supply agreement. Initially, the court allowed Mountain Pure to nonsuit its defect-based claims for breach of contract and breach of warranties. However, the court ultimately vacated those nonsuits and granted the vendors summary judgment on those claims. Mountain Pure had conceded that, while it could prove the total damages it suffered from the allegedly defective jugs, caps, and cartons, it could not apportion those damages exactly among the vendors. The court held that Mountain Pure could not "meet its burden of proof on the causes of action for breach of contract" and could not apportion damages to each vendor.

The circuit court later granted summary judgment to all the vendors on their debt counterclaims. In doing so, the court relied

---

[2] The legend of the Gordian knot was aptly explained by the Eighth Circuit in *Prudential Insurance Co. of America v. National Park Medical Center, Inc.*, 154 F.3d 812, 819 n.4 (8th Cir. 1998), as follows:

> Gordius, King of Phrygia, tied his chariot to a hitching post before the temple of an oracle with an intricate knot, which, it was prophesied, none but the future ruler of all Asia could untie. In the course of his conquests, Alexander the Great came to Phrygia, and, frustrated with his inability to untangle the "Gordian knot," simply sliced through it with his sword. His subsequent success in his Asian campaign has been taken to mean that his solution to the "Gordian knot" fulfilled the prophesy. (Internal citations omitted.)

on its earlier summary judgments on Mountain Pure's contract and warranty claims against the vendors. The court rejected Mountain Pure's argument that the record established genuine issues of material fact on Mountain Pure's affirmative defense of defect to the vendors' claims for non-payment. Mountain Pure now appeals, limiting its claims of error to the summary judgments for Affiliated on the supply agreement and for the vendors on their debt counterclaims. Mountain Pure challenges the circuit court's grant of summary judgment on Mountain Pure's contract and warranty claims against the vendors only insofar as the court's decision is incorporated into the defect and debt issues on appeal.

We begin our plenary review of the record with the written supply contract between Mountain Pure and Affiliated, viewing all evidence and resolving all inferences in Mountain Pure's favor. *See Cole v. Laws*, 349 Ark. 177, 185, 76 S.W.3d 878, 882 (2002) (outlining summary-judgment review standard). According to Jerry Davis, the President and CEO of Affiliated, the sale of the plant was conditioned on the execution of this agreement. John Stacks, the President and CEO of Mountain Pure, concurred by stating that his company "relied upon that agreement when [it] acquired the Mountain Pure business from Affiliated." The agreement, dated January 21, 2000, required that Mountain Pure supply Affiliated with quality water and juice products; it obligated Affiliated to use Mountain Pure as its "primary supplier of water and juice products" for eight years after the plant sale.

The supply agreement also outlined a procedure whereby, under certain conditions, Affiliated could make major purchases of water and juice from other suppliers. The breach-of-contract dispute now before us turns on this provision, which states:

> Affiliated will only make major purchases of water and juice products from another supplier only (i) after a "Failure to Cure," when and this only so long as the Failure to Cure continues experiencing or (ii) where Supplier cannot meet Affiliated's needs due to a condition beyond Supplier's control (force majeure). "Failure to Cure" shall mean Supplier's failure to cure any quality problems within three (3) business days after Affiliated shall have delivered to Supplier written notice specifying the nature of the quality problem. The term "a condition beyond Supplier's control" will mean a delay if and to the extent caused by occurrences beyond the reasonable control of Supplier, including, but not limited to, acts of God, embargoes, governmental restrictions, governmental rationing, fire, flood, drought, earthquake, torna-

does, hurricanes, explosions, riots, wars, civil disorder, failure of public utilities or common carriers, labor disturbances, rebellion or sabotage.

As anticipated by this provision, beginning in April 2001, there were "quality" problems with Mountain Pure's products. The record contains several letters between Affiliated and Mountain Pure documenting the parties' efforts to address these problems. The majority of the deposition testimony in this case outlines the various steps that the parties undertook to resolve the leaky-product dilemma. Mountain Pure offered proof that it had cured most of the problems no later than October 2001. Affiliated offered proof that the problems were never resolved. It is undisputed that Affiliated failed to resume using Mountain Pure as its "primary supplier" of water and juice products.

Giving Mountain Pure's evidence the highest probative value, as we must, it is clear that a question of material fact remains as to when — or if — Mountain Pure cured the "quality" problems with its products. Affiliated responds that this question of fact notwithstanding, summary judgment is still the proper remedy because the undisputed proof establishes that the product inadequacies continued well beyond three days. However, such a conclusion is based on a contorted reading of the supply agreement's time-to-cure provision.

Affiliated is mistaken as to what the contract's cure provision does and — more importantly — does not provide. The plain and unambiguous language of the contract establishes an outward limit of three days for Mountain Pure to cure before Affiliated's *right to buy from other suppliers* is triggered. It does not establish an outward limit of three days for Mountain Pure to cure before Affiliated *can be released from a long-term supply agreement* that was inextricably linked to a multi-million dollar plant purchase. When contracting parties express their intention in a written instrument in clear and unambiguous language, it is the court's duty to construe the writing according to the plain meaning of the language employed. *Holytrent Props., Inc. v. Valley Park Ltd. P'ship*, 71 Ark. App. 336, 32 S.W.3d 27 (2000).

Affiliated alternatively argues that "under no circumstances" can it be said that there is "no time limit" for Mountain Pure to cure, because the Uniform Commercial Code inserts a "reasonable time" provision when a contract is silent as to cure time. *See* Ark. Code Ann. § 4-2-609 (Repl. 2001). Affiliated insists that once

Mountain Pure failed to provide adequate assurances of due performance within a reasonable time (not to exceed thirty days) the contract was repudiated by Mountain Pure, and Affiliated had no further obligation to perform under the supply agreement.

■ However, Affiliated underestimates the completeness of the contract into which it freely entered. The sale-linked agreement bound the parties for a limited, eight-year period and anticipates performance problems over the course of the parties' relationship. If the problems were not resolved within three days, Affiliated was permitted to buy product from other suppliers "only so long as" Mountain Pure was in the process of curing, but no longer. Because a question of material fact remains as to whether Mountain Pure had cured the defect in its product, summary judgment was prematurely granted by the circuit court and we reverse and remand the case for trial.[3]

Next, we turn our attention to Mountain Pure's claim that the trial court erred by granting Stone and Consolidated summary judgment on their debt counterclaims. According to Mountain Pure, the vendors breached their contracts by providing defective goods and, therefore, Mountain Pure should be allowed to deduct its damages from any amounts it might owe them. It relies on Ark. Code Ann. § 4-2-717 (Repl. 2001), which permits a buyer, after acceptance of nonconforming goods and notification to the seller, to deduct all or any part of the damages resulting from any breach of the contract from any part of the price still due under that contract. Mountain Pure correctly maintains that, according to Ark. Code Ann. § 4-1-106(1) (Repl. 2001), this defense should be liberally applied.[4]

■ We agree that in a debt-defense context, Mountain Pure was not required to prove vendor-specific damages with mathematical accuracy to defeat the vendors' motions for summary judgment; it simply had to offer evidence that it was damaged by

---

[3] Assuming arguendo that the contract's cure provision did not supply a remedy for chronic-performance failure (which would surely exceed a year and a half of an eight-year contract), a fact-intensive, UCC-based "reasonable assurance" repudiation inquiry could be triggered. This inquiry usually presents a question of fact — what is reasonable — which generally cannot be disposed of by summary judgment. *See generally Ford Motor Credit Co. v. Ellison*, 334 Ark. 357, 974 S.W.2d 464 (1998).

[4] This liberal administration of remedies was repealed by Act 856 of 2005. *See* Ark. Code Ann. § 4-1-106 (Supp. 2005).

defects in each of the vendor's products. Arkansas law has never required exactness of proof in determining the amount of damages. Recovery will not be denied merely because the damages are difficult to ascertain; if it is reasonably certain that some loss has occurred, it is enough that damages can be stated only approximately. *Morton v. Park View Apartments*, 315 Ark. 400, 868 S.W.2d 448 (1993). Accordingly, the circuit court erred in requiring Mountain Pure to allocate an exact amount of damages to each vendor in a debt-offset context.

■ Also, Mountain Pure's damage evidence created issues of fact for the jury. Evidence was presented that the boxes supplied by Stone were not scored properly; that they were not square and had inconsistent thicknesses; that they failed crush tests; that dry boxes fell apart; that the inner and outer skins of the cardboard pulled apart; that the boxes sometimes arrived damp; and that the flaps did not fold properly and were not uniform.[5] Mountain Pure also presented testimony that some of the bottles supplied by Consolidated contained carbon specks resulting from the manufacturing process that could cause leaks; that some bottles were not trimmed properly; and that one bottle demonstrated that its mold had been out of alignment. Many of these alleged product defects were denied by the responsible vendor. Others were admitted, but the impact of the defect on Mountain Pure's debt was disputed. Either way, a classic dispute of material fact is presented. Such disputes are to be resolved by the trier-of-fact, which in this case is a jury.

It is certainly tempting to sever the stranglehold of this Gordian knot in true Alexander the Great form with a swift slash of the summary-judgment sword. However, because this case presents many disputed issues of material fact, we must rely on the jury to untangle the knot, one strand at a time.

Reversed and remanded.

GRIFFEN and ROAF, JJ., agree.

---

[5] It is of no import that the boxes that Mountain Pure identified in discovery as evidence proving its allegations were examined by Stone's representative, Charles Shelton, who found them to be within specifications. Once a question of fact is properly established, a subsequent denial does not trigger an obligation to re-establish a material dispute of fact. To condone such an approach in the summary-judgment context — the last in time wins — would invite a childish denial dialogue: "did not," "did too," "did not — infinity."