IN THE SUPREME COURT OF APPEALS OF WEST VIRGINIA

January 2022 Term

_____

No. 20-0759

_____

**FILED**

**April 18, 2022**

released at 3:00 p.m.
EDYTHE NASH GAISER, CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

HORIZON VENTURES OF WEST VIRGINIA, INC.,
Petitioner,

v.

AMERICAN BITUMINOUS POWER PARTNERS, L.P.,
Respondent.

_____

Appeal from the Circuit Court of Marion County
Business Court Division
The Honorable James H. Young, Jr., Judge
Civil Action No. 18-C-130

REVERSED AND REMANDED

_____

AND

_____

No. 20-0762

_____

AMERICAN BITUMINOUS POWER PARTNERS, L.P.,
Petitioner,

v.

HORIZON VENTURES OF WEST VIRGINIA, INC.,
Respondent.

_____

Appeal from the Circuit Court of Marion County
Business Court Division
The Honorable James H. Young, Jr., Judge
Civil Action No. 18-C-130

REVERSED AND REMANDED

_____

Submitted: January 25, 2022
Filed: April 18, 2022

Mark A. Kepple, Esq.                    Roberta F. Green, Esq.
Benjamin P. Visnic, Esq.                John F. McCuskey, Esq.
Bailey & Wyant, PLLC                    Shuman McCuskey Slicer PLLC
Wheeling, West Virginia                 Charleston, West Virginia


Joseph G. Nogay, Esq.                   Counsel for American Bituminous Power
Sellitti Nogay & Nogay, PLLC            Partners, L.P.
Weirton, West Virginia


Counsel for Horizon Ventures of
West Virginia, Inc.

JUSTICE WALKER delivered the Opinion of the Court

JUSTICE ALAN D. MOATS, sitting by temporary assignment, not participating

**SYLLABUS BY THE COURT**

1.     "A circuit court's entry of summary judgment is reviewed *de novo*."
Syllabus Point 1, *Painter v. Peavy*, 192 W. Va. 189, 451 S.E.2d 755 (1989).

2.     "Summary judgment is appropriate where the record taken as a whole
could not lead a rational trier of fact to find for the nonmoving party, such as where the
nonmoving party has failed to make a sufficient showing on an essential element of the
case that it has the burden to prove." Syllabus Point 4, *Painter v. Peavy*, 192 W. Va. 189,
451 S.E.2d 755 (1989).

3.     "The circuit court's function at the summary judgment stage is not to
weigh the evidence and determine the truth of the matter, but is to determine whether there
is a genuine issue for trial." Syllabus Point 3, *Painter v. Peavy*, 192 W. Va. 189, 451 S.E.2d
755 (1989).

4.     "The determination of whether a deed, contract, or other writing is
ambiguous and does not clearly express the intention of the parties is a question of law to
be determined by the court." Syllabus Point 3, *Harrell v. Cain*, 242 W. Va. 194, 832 S.E.2d
120 (2019).

5.     "If a circuit court finds that a deed, contract, or other writing is
ambiguous and does not clearly express the intention of the parties, then the proper

i

interpretation of that ambiguous document, when the facts are in dispute, presents a question of fact for the factfinder to resolve after considering all relevant extrinsic evidence." Syllabus Point 4, *Harrell v. Cain*, 242 W. Va. 194, 832 S.E.2d 120 (2019).

6. "'A motion for summary judgment should be granted only when it is clear that there is no genuine issue of fact to be tried and inquiry concerning the facts is not desirable to clarify the application of the law.' Syllabus Point 3, *Aetna Casualty & Surety Co. v. Federal Insurance Co. of New York*, 148 W. Va. 160, 133 S.E.2d 770 (1963)." Syllabus Point 1, *Andrick v. Town of Buckhannon*, 187 W. Va. 706, 421 S.E.2d 247 (1992).

WALKER, Justice:

American Bituminous Power Partners, L.P. (AMBIT) owns and operates a power plant that sits on land owned by Horizon Ventures of West Virginia, Inc. The parties created a contractual relationship in 1989, with a Lease Agreement establishing the rent that AMBIT would pay to Horizon. In the thirty-one years between the execution of that Lease and these appeals, the parties have engaged in dispute after dispute, case after case, over the rate of AMBIT's rent. This litigation history has produced two documents that are the crux of the current appeals, in addition to the Lease: a 1996 Settlement Agreement and a 2017 order of the business court.

Now the parties are, once again, embroiled in a rent dispute. Resolution depends on a determination of the relationship of those three documents. The business court granted summary judgment to AMBIT on Horizon's claims and summary judgment to Horizon on AMBIT's claims without resolving the relationship between those documents. So, we conclude that the business court erred in granting summary judgment to either party when it is plain that the underlying premise of each party's claim remains unresolved. Likewise, summary judgment was not proper because the various agreements at issue here are ambiguous, and the intent of the parties is not clear. For that reason, genuine issues of material fact remain. We therefore reverse the business court's February 6, 2020 and July 30, 2020 orders and remand for further proceedings consistent with this opinion.

## I. FACTUAL AND PROCEDURAL BACKGROUND

These parties have a protracted, convoluted, and litigious relationship dating back to the formation of their lease agreement on November 29, 1989. Much of that history is irrelevant to our analysis here, but the backdrop of that continuous litigation informs the issues presented in these appeals. At base, Horizon is the landlord and AMBIT is the tenant of certain parcels of property in Marion County, West Virginia. That property was leased for the purpose of constructing and operating a coal-fired power plant, now operated and maintained as the Grant Town Power Plant. The parties' arrangement is governed by a Lease Agreement that has been amended several times since its November 29, 1989 formation.

The Lease Agreement sets forth AMBIT's rent as determined by the availability and usability of waste coal material on the property to fuel the Power Plant. Specifically, it depends on whether AMBIT uses "local fuel" (i.e., waste coal on the property) or "foreign fuel" (i.e., non-Horizon fuel from outside sources). If AMBIT burns usable local fuel, its rent is three percent of AMBIT's gross revenues.[1] If AMBIT burns

---

[1] Horizon's briefing on appeal states that the local fuel rate is one percent of gross revenues, and that foreign fuel used for operating reasons carries a rate of three percent of gross revenues. At other points in the brief, it states the three-percent rate for local fuel and foreign fuel used for non-operating reasons and the one percent rate for foreign fuel used for operating reasons. Despite this apparent discrepancy, we adhere to the language of the Lease, which states that local fuel and foreign fuel used for non-operating reasons carry the same rate of rent at three percent, and foreign fuel used for operating reasons carries a lower, one-percent rate citing that the parties acknowledge "that [AMBIT] has calculated that it will incur additional costs for transporting and handling foreign fuel which costs are

2

foreign fuel, the Lease distinguishes whether the use of foreign fuel was for an "operating reason" or a "non-operating reason." Foreign fuel used for an operating reason imposes a rent calculation of one percent of AMBIT's gross revenues, the lower rate accounting for the need to transport and handle foreign fuel to keep the Power Plant operational. Consistent with that notion, if foreign fuel is used for a *non*-operating reason, AMBIT must still pay the full three percent.

"Operating reason" under the Lease means that AMBIT

*in its reasonable judgment*, has determined that a percentage (partial or total) of Foreign Fuel is required for any one or more of the following reasons: (a) to achieve and maintain the manufacturer's rated output of any Plants on the Demised Premises; (b) to operate any Plants on the Demised Premises in a safe manner; (c) to operate the Initial Cogeneration Plant in compliance with the Electric Energy Purchase Agreement . . . between [AMBIT] and Monongahela Power Company . . . (d) to operate any Plants on the Demised Premises in compliance with any operation and maintenance manual prepared or modified by the person who, or the entity which, designs, constructs, manufactures, repairs, modifies or improves the Plants or the equipment therein and all laws or regulations applicable to such Plants; (e) due to the inability of [AMBIT] to use Local Fuel as a result of any law, rule, regulation or order of any court or other administrative, governmental or quasi-governmental agency or authority . . . ; or (f) *due to exhaustion of the usable waste coal material on the Demised Premises*.[2]

approximately equal to 2% of the gross revenue attributable to the burning of the Foreign Fuel[.]"

[2] Emphasis added.

A "non-operating" reason, by contrast, means that AMBIT "has determined, *in its sole judgment*, to partially or exclusively use Foreign Fuel to the extent (i) such use is designed to reduce the cost of limestone usage by a Plant or (ii) there is no Operating Reason to do so."[3] Apparently anticipating that such standards would lead to conflict, the parties agreed that any dispute

> shall be submitted to the consulting engineer retained by the "Lenders" . . . or, if such consulting engineer refuses or is unable to serve in such capacity, by any qualified, competent engineer acceptable to [Horizon] and [AMBIT]. The decision of the engineer to which the dispute is submitted shall be binding on both [Horizon] and [AMBIT].

Despite this provision for an arbiter of sorts, the parties have previously litigated rent calculation disputes. Important for our purposes is a 1996 Settlement Agreement that ended several ongoing bouts of litigation over the rent calculation. The 1996 Settlement Agreement at section 2.a. contains the following admissions by AMBIT:

> [AMBIT] acknowledges, as a fact, that since the commencement of operations by the Plant, all Foreign Fuel used in the operation of the Plant has been used for Non-Operating Reasons, and further acknowledges, as a fact, that *so long as* any Local Fuel is located at the Demised Premises, any Foreign Fuel being used in the operation of the Plant is being used for Non-Operating Reasons. As contemplated by the Lease, Local Fuel includes "waste coal material" (as defined in the Lease) on the Demised Premises, whether or not permitted by permits whose issuance or continuance is subject to actions which are within [AMBIT]'s control and whether or not reclaimed, and is not dependent on the quality of the waste coal material. [AMBIT] expects and intends that Horizon will

---

[3] Emphasis added.

4

detrimentally rely on this factual admission, that such reliance is foreseeable by [AMBIT] and reasonable on the part of Horizon, and that such reliance is evidenced by Horizon's execution and delivery of this Agreement. [AMBIT] further acknowledges and agrees that [AMBIT] has no claim to recover any rents paid to Horizon prior to the date of this Agreement.[4]

Stated concisely, in the 1996 Settlement Agreement, AMBIT made admissions that it had been using foreign fuel for "non-operating reasons" since the plant began operating, and "so long as" any local fuel is available (regardless of the quality of waste coal), any use of foreign fuel "is being used for Non-Operating Reasons."

In the 1996 Settlement Agreement, Horizon agreed to reduce the rate of rent calculation from the three percent under the Lease to two-and-a-half percent. The parties would later dispute whether that lower rent percentage reflected an attempt to set aside the question of "usability" in the future (i.e., that the rate was lowered in exchange for the admissions made by AMBIT to apply prospectively) or whether it agreed to lower the rate simply to settle the lawsuit. Either way, ambiguity was injected into the equation as to the purview of the 1996 Settlement Agreement and AMBIT's admissions as they relate to the terms of the Lease, because the 1996 Settlement Agreement states at section 14:

This Agreement constitutes the entire agreement between the Parties and supersedes all prior and contemporaneous agreements, representations, warranties, and understandings of the Parties, whether oral, written or implied, as to the subject matter hereof; provided, however, that *this Agreement does not supersede the Lease*, except only that the provision in

---

4 Emphasis added.

5

paragraph 4 [Obligations to Be Performed on the Closing Date] of this Agreement for the dismissal of the Pending Action and the provisions of paragraph 5 [Horizon's Waiver of a Portion of Post-April Percentage Rent] of this Agreement for the waiver of the Waived Percentage Rent and related provisions of paragraph 5 shall limit Horizon's rights under the lease.[5]

The parties operated under a two-and-a-half percent rent calculation under the 1996 Settlement Agreement through December 2012, when AMBIT stopped paying rent. Horizon filed a lawsuit for unpaid rent and AMBIT filed a counterclaim for overpaid rent, contending that the usable local fuel had been exhausted and it should have only been paying at the one percent rate. In addition to the rent calculation, at issue in that case was the priority of payments to Horizon. Specifically, where in the list of priority AMBIT's payments to Horizon fell when the Lease Agreement provides that Horizon's receipt of payment was subordinated to the payment of "Senior Debt." The circuit court granted summary judgment in favor of Horizon as to Count I of its complaint, relating to the priority of payments and as to Count II of AMBIT's counterclaim, relating to the overpayment of rent.[6] AMBIT then appealed to this Court.

---

[5] Emphasis added.

[6] *Am. Bituminous Power Partners, L.P. v. Horizon Ventures of W. Va., Inc.*, No. 14-0446, 2015 WL 2261649 at *5 (W. Va. May 13, 2015) (memorandum decision).

In this Court's decision issued in that case (*AMBIT I*),[7] we reversed the entry of summary judgment and remanded with directions that it be transferred to the business court division due to the complexity of the issues presented. *AMBIT I* focused primarily on the priority of payment, which is not at issue in this appeal. But it did conclude that summary judgment as to the rent calculation could not have been proper either because we found the 1996 Settlement Agreement and the Lease were ambiguous and not amenable to summary judgment:

> Horizon relies upon the [1996 Settlement Agreement] to remove "usable" local fuel from the rent calculation altogether. However, this contract resolved a dispute between AMBIT and Horizon at the time it was executed and AMBIT maintains it has no prospective application, with limited exceptions not applicable here. Nevertheless, this contract is ambiguous on its face because by its express terms, it "does not supersede the Lease." And the terms of the Lease provide that rent is calculated based on whether usable local fuel is on the premises. Significantly, AMBIT's Plant Manager executed an affidavit stating all usable local fuel was exhausted in 2003. Accordingly, we find factual issues remain including whether the parties intended for the terms of the Agreement to Resolve Pending Litigation to operate prospectively and, if not, whether usable local fuel remains on the premises.[8]

---

[7] We acknowledge that these parties have been engaged in prior litigation and have been before this Court many times prior to *AMBIT I*, and many times since, litigating disputes in various contexts. We use "*AMBIT I*" only for ease of reference to the prior litigation in which rent calculation was addressed, the 2015 opinion issued by this Court, and the resultant remand.

[8] *Id.* at *6.

7

We then concluded "[v]iewing the evidence in the summary judgment appendix record in the light most favorable to AMBIT, this Court finds the contracts are ambiguous on both disputes on appeal. Determining issues of priority of rent and whether AMBIT overpaid requires factfinding."[9] On remand, the business court concluded that in filing the action to collect rent from AMBIT without seeking the necessary consent of a third-party, Horizon had breached the parties' Lease Agreement. That conclusion is important in this appeal because Horizon was precluded from bringing its suit to seek payment of rent in that Prior Litigation. Horizon's inability to seek payment of rent prompted the business court to dismiss AMBIT's counterclaim for overpaid rent *without prejudice* in its August 13, 2017 order:

> for the sake of equity and judicial economy as the issues regarding the payment of rent between AMBIT and Horizon need to be pursued together, as potential damages are likely to offset one another. As detailed above, Horizon is currently precluded from bringing an action to seek rent. Therefore, to further the prospect of judicial economy Count II of AMBIT's Counterclaim is dismissed without prejudice.

As to the interaction between the 1996 Settlement Agreement and the Lease, the 2017 Order concluded that section 14 of the 1996 Settlement Agreement "is clear in limiting the applicability of the [1996 Settlement Agreement] as it provides that the agreement did not supersede the Lease Agreement except for two sections, paragraph four – listing the parties['] closing obligations and paragraph five – Horizon's waiver of a

---

[9] *Id.*

8

portion of post-April percentage of rent." Noting that the 1996 Settlement Agreement was "convoluted and ambiguous in many respects[,]" the business court nevertheless determined at summary judgment that "the percentage of rent payment shall be determined pursuant to the terms of the Lease Agreement subject to any waiver of a portion of percentage of rent as determined by the formula laid out in paragraph five of the 1996 [Settlement] Agreement." Importantly, neither party appealed the 2017 Order.

AMBIT then filed the underlying lawsuit against Horizon, bringing its overpayment-of-rent claim that had been dismissed without prejudice in the 2017 Order.[10] AMBIT's claim is derived from the contention that the usable local fuel was exhausted in 2003, and that since then, foreign fuel has been used for operating reasons (meaning it should have been paying one percent of gross revenues since that time according to the terms of the Lease Agreement). Horizon counterclaimed seeking declaratory judgment that AMBIT had an obligation to pay rent in accordance with the 1996 Settlement Agreement and claiming that AMBIT (1) misrepresented the amount of usable local fuel and (2) needed to use foreign fuel as opposed to local fuel because AMBIT had inadequately designed or constructed the Power Plant.[11]

---

[10] AMBIT's suit was originally filed in the Circuit Court of Marion County but was referred to the business court division.

[11] When filing its counterclaim, Horizon had still not obtained the requisite third-party consent that had resulted in dismissal of its claim for unpaid rent in the 2017 Order. However, the business court allowed Horizon to proceed on its declaratory judgment action

9

After the close of discovery, AMBIT filed a motion for summary judgment on Horizon's counterclaim. Despite Horizon's request for a declaration that the 1996 Settlement Agreement controlled the rent calculation of the parties, neither the 1996 Settlement Agreement – including AMBIT's admissions – nor the 2017 Order are addressed by the business court. Rather, it presumed that the Lease controlled the rent calculation. AMBIT argued that whether it was using foreign fuel for an operating or non-operating reason was an exercise of its reasonable judgment under the terms of the Lease – discretion for which it had bargained. In other words, AMBIT argued that the question was simply whether AMBIT had used its discretion to use foreign as opposed to local fuel for operating reasons in an arbitrary or capricious way. Horizon argued that under the terms of the Lease, it needed to show that there was no operating reason for AMBIT's use of foreign fuel as the term "operating reason" is defined under the Lease – not that AMBIT acted arbitrarily or capriciously. And regardless, Horizon argued, those questions were appropriate for jury resolution, not summary judgment.

The business court first determined that the arbitrary and capricious standard was the appropriate measuring stick under the terms of the Lease, concluding that "evidence of poor management, mismanagement or bad design, industry standard or

since it would be one single action to determine the calculation of rent because AMBIT was suing for overpayment of rent. Due to the lack of third-party consent, however, the business court limited the declaratory judgment action to the calculation, not collection, of rent.

10

perfection, anything of that nature is not relevant to whether AMBIT used its independent discretion arbitrarily and capriciously as a matter of law." But, the business court denied AMBIT's motion for summary judgment, concluding that "reasonable minds could differ as to whether AMBIT used its contracted-for independent discretion arbitrarily and capriciously **as that term is used in the law** in using Foreign Fuel for Operating Reasons from December 2012 to the present."[12]

AMBIT renewed its motion for summary judgment, arguing that it was entitled to summary judgment under an arbitrary and capricious standard because the question was not whether AMBIT was right or wrong or whether Horizon would have chosen differently. Instead, AMBIT argued, the issue was limited to whether its decision-making was rational or supportable, and Horizon had produced no evidence that its decisions were impulsive, erratic, or without basis. Horizon again raised that a jury should determine (1) whether AMBIT's refusal to use local fuel to power the Power Plant was arbitrary and capricious and (2) whether that refusal was for an operating reason or a non-operating reason *under the Lease*, not just whether there was some legitimate reason for its use of foreign fuel.

This time, the business court granted AMBIT's renewed motion for summary judgment, concluding

---

[12] Emphasis in original.

11

Considering all of the source materials available to date on 'arbitrary and capricious' leads to a finding under the law that AMBIT's use of its contractual grant of discretion must be upheld as a matter of law because AMBIT as a matter of law has given proper weight to decisional factors, acted rationally, adopted plausible positions, and considered the important factors. Horizon produced no evidence that AMBIT committed plain error in selecting and using Foreign Fuel for Operating Reasons.

Stated differently, the business court determined that under the terms of the Lease Agreement, AMBIT had bargained for discretion that subjected it only to an arbitrary and capricious standard in determining whether it was using foreign fuel for operating or non-operating reasons. And, AMBIT had used foreign fuel that, in its judgment, was necessary for operating reasons (including economic and quality considerations), making its rent obligation one percent. Horizon appeals that July 30, 2020 order.

As to AMBIT's claim for overpayment of rent, Horizon filed a motion for summary judgment, arguing that the 1996 Settlement Agreement, or, more particularly, AMBIT's admissions, applied to preclude AMBIT's suit under principles of res judicata, collateral estoppel and judicial estoppel. Specifically, Horizon argued that AMBIT was estopped from adopting a position different from that espoused in its prior admissions. Horizon also argued that waiver and the doctrine of laches precluded AMBIT's claims. The business court agreed that AMBIT was precluded from pursuing overpaid rent from the period of 1996 to 2013 under a waiver and laches analysis.

12

In granting Horizon's motion for summary judgment, the court applied the admissions contained in the 1996 Settlement Agreement and found that AMBIT had paid rent "as if 'Local Fuel' remained on the lease premises as provided by the 1996 [Settlement] Agreement." It also found that AMBIT had "made the same arguments regarding 'Local Fuel' vers[u]s 'Foreign Fuel' . . . in [*AMBIT I*] and that it is asserting in this litigation despite the admission made in Section 2a of the [1996 Settlement Agreement] and the express agreement to not make such claims after" that 1996 Settlement Agreement was executed. So, the business court concluded that waiver operated to preclude AMBIT's claims, because AMBIT had "voluntarily relinquished any claim that useable 'Local Fuel' no longer existed from [execution of the 1996 Settlement Agreement] up through and including July 29, 2013[,] which is the date of the filing of the counterclaim in [*AMBIT I*]." And, in delaying so long to file its claim for overpayment of rent, the business court determined that the doctrine of laches applied to preclude AMBIT's claim. But the business court, without analysis, rejected Horizon's argument that res judicata, judicial estoppel, and collateral estoppel applied as well. The business court granted summary judgment in favor of Horizon, and AMBIT appeals that decision to this Court.

## II. STANDARD OF REVIEW

The business court's entry of summary judgment for both Horizon and AMBIT on their respective claims is reviewed anew: "[a] circuit court's entry of summary judgment is reviewed *de novo*."[13] We have discussed that

> [s]ummary judgment is appropriate where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, such as where the nonmoving party has failed to make a sufficient showing on an essential element of the case that it has the burden to prove.[14]

Importantly, "[t]he circuit court's function at the summary judgment stage is not to weigh the evidence and determine the truth of the matter, but is to determine whether there is a genuine issue for trial."[15]

## III. ANALYSIS

Relating to Horizon's appeal, Horizon argues that the 1996 Settlement Agreement removed the question of usability from the rent calculation equation. Specifically, it argues that the admissions made by AMBIT (that "so long as" there is *any* Local Fuel available, any use of Foreign Fuel is for a non-operating reason) are prospective in nature and serve to supersede those provisions in the Lease relating to the determination of whether fuel is being used for operating or non-operating reasons, and consequently, the

---

[13] Syl. Pt. 1, *Painter v. Peavy*, 192 W. Va. 189, 451 S.E.2d 755 (1989).

[14] *Id.* at Syl. Pt. 4.

[15] *Id.* at Syl. Pt. 3.

quality of the local fuel raised by AMBIT is a non-issue. To this, AMBIT responds that the 2017 Order already determined that the 1996 Settlement Agreement did not supersede the Lease. But the parties disagree as to the scope of the 2017 Order; Horizon argues it did not apply to the admissions and AMBIT argues that it definitively did. Horizon also argues in the alternative that even if the Lease applies to the exclusion of the admissions, the business court erred in (1) applying an arbitrary and capricious standard and (2) concluding that there were no issues of material fact.

On the other hand, AMBIT's appeal is centered on the allegedly flawed application of waiver and laches to preclude its claims for overpaid rent. AMBIT argues that the business court improperly concluded that it could intentionally waive a right before the statute of limitations had run, and that the parties were both operating under a "mutual mistake" of what the rent should be from 2003 forward, when AMBIT claims the usable local fuel was exhausted. AMBIT appeals the business court's conclusion that it could have intentionally waived a right when it was unclear to both parties until the 2017 Order that the payments from 2003 to 2013 were made by AMBIT and received by Horizon with the erroneous belief that they were correct under the 1996 Settlement Agreement.

In reviewing AMBIT and Horizon's respective arguments, our judgment would be too hasty were we to travel down the paths of the finer attunements of waiver, laches, and the arbitrary and capricious standard. Those questions are futile to resolve when there was a fork in the road, and we do not know whether we have been directed

15

down the correct path. Questions as to the scope of 2017 Order and the viability of the admissions in the 1996 Settlement Agreement are the undercurrent of both AMBIT's and Horizon's appeals; neither appeal can be resolved independently of the other because they both turn on the continuing viability of those admissions made in the 1996 Settlement Agreement. Horizon's entire claim hinges on the admissions AMBIT made and summary judgment was granted to Horizon on the basis that the *Lease* (and not the admissions relating to usability) controlled the rent calculation of the parties. Yet the business court relied on the admissions AMBIT made in the 1996 Settlement Agreement to find that it had intentionally waived its claims for overpaid rent by paying under the terms of the 1996 Settlement Agreement and that its claims were barred by the doctrine of laches. Both parties contend that the scope of the 2017 Order (whether narrow or broad) is supportive of their case. So, we have apparently contradictory orders as to the relationship between the 1996 Settlement Agreement and the Lease Agreement. Exacerbating that predicament, neither the summary judgment orders nor the record below include findings as to the scope or applicability of the 2017 Order or the continued viability of the admissions – findings that were necessarily critical to the parties' arguments at summary judgment regarding the primacy of the Lease Agreement or Settlement Agreement and critical, now, to our review.

As to the 2017 Order, we are left wondering whether the findings and conclusions of the business court relating to the interaction between the 1996 Settlement Agreement and the Lease Agreement when it comes to the calculation of rent are even applicable here when the role of AMBIT's admissions are at issue. First, even if the 1996

Settlement Agreement does not supersede the terms of the Lease, did that 2017 Order also definitively determine that AMBIT's *admissions* are also subordinate to the Lease? If so, can a court determine as a matter of law that the Admissions were not intended to be prospective in nature? When faced with this exact question by these exact parties in *AMBIT I*, we determined that "factual issues remain including whether the parties intended for the terms of the [1996 Settlement Agreement] to operate prospectively and, if not, whether usable local fuel remains on the premises."[16] Due to the ambiguity of the agreements, we specifically noted that summary judgment was improper relative to whether AMBIT overpaid rent, citing that

> "[w]here a contract is ambiguous then issues of fact arise and a summary judgment is ordinarily not proper." Syl. Pt. 2, *Lee Enters., Inc. v. Twentieth Century-Fox Film Corp.*, 172 W. Va. 63, 303 S.E.2d 702 (1983). *See generally Wolter v. Equitable Res. Energy Co., W. Region*, 979 P.2d 948, 951 (Wyo. 1999) ("In cases requiring the interpretation of a contract, a summary judgment is appropriate only if the contract is clear and unambiguous.")[.][17]

On first read, the 2017 Order appears to have ignored that directive from this Court's opinion in *AMBIT I*, but on second, perhaps it did not. The business court specifically noted the convoluted and ambiguous nature of the 1996 Settlement Agreement but answered the question of whether the 1996 Settlement Agreement superseded the Lease as far as rent calculation, as a matter of law, finding the specific provision it was examining

---

[16] *AMBIT I*, 2015 WL 2261649 at *6.

[17] *Id.* at *7.

17

to be clear. But notably, the admissions are not mentioned anywhere in the 2017 Order. Instead, it refers to the lack of prospective nature of the percentage rate (two-and-one-half percent versus three percent) under the plain language of Section 14 of the 1996 Settlement Agreement but not the prospective nature of the admissions contained in Section 2 of that same document.

Moreover, the 2017 Order dismissed Horizon's claim for unpaid rent on other grounds (failure to seek permission of a required third party) and dismissed AMBIT's claim for overpaid rent *without prejudice* so as to let Horizon's and AMBIT's claims for rent proceed together in subsequent litigation. In that respect, it appears the business court made the findings as to the interrelation between the 1996 Settlement Agreement (but maybe not the admissions), and yet did not apply those findings to Horizon's and AMBIT's rent calculation claims to dispose of them. Given that neither party appealed that 2017 Order, more questions arise as to whether the parties are bound by those findings as it relates to the lack of clarity surrounding its application to the admissions.

In arguing against application of res judicata to its own claims, AMBIT admitted "the issue of overpaid rent was not finally adjudicated [in *AMBIT I*] because of that dismissal without prejudice to refiling." It nevertheless asked the business court to apply res judicata to Horizon's claim that the 1996 Settlement Agreement – and more specifically, AMBIT's admissions in it – governed the rights of the parties when it comes to rent calculation. It did so with the knowledge that the 2017 Order did not dispose of

18

Horizon's claim in *AMBIT I* by way of rent calculation interpretation, and that it specifically delineated that the parties should commence their cases for unpaid/overpaid rent *together*.

To steal a phrase used at oral argument, the essentials of this case boil down to which "cookbook" the parties are using – the 1996 Settlement Agreement and the Admissions made therein, or the Lease Agreement. It is clear from *AMBIT I* that that question is riddled with ambiguity. When we add the 2017 Order to the mix, we inject even more confusion as to whether that ambiguity was actually resolved. The business court recognized the confusion in opting to grant Horizon's motion for summary judgment on waiver and laches as opposed to res judicata, collateral estoppel and judicial estoppel[18]:

> Okay. I find that the issues raised in this motion by [Horizon] under the pretext of judicial estoppel, collateral estoppel, res judicata, should be denied, as I think those matters were covered to the reverse or adverse of what position Horizon has taken in the Court's previous finding. *I think there may be some merit raised by [Horizon] as to were those matters really binding upon the parties, because the Court was not determining rent at that time period.* I mean, those were issues that the Court was weeding out about what I could proceed on pursuant to the lease and what I couldn't. We were in the process of going through the waterfall and what the rankings were, but regardless of that, I do find that [Horizon]

---

[18] The transcript of this finding on the record is somewhat vague given the hedging statements that follow. The order makes no mention of judicial estoppel. And, while the order delineates the standards of res judicata and collateral estoppel it concludes without analysis that "the doctrines of res judicata and collateral estoppel do not apply to the claims asserted in the plaintiff's complaint."

has raised the issues of waiver, which I find that AMBIT has waived its rights by its conduct that any mistake was made.[19]

The applicability of the admissions remained up in the air later in that same hearing, when the business court took up AMBIT's motion for summary judgment:

> The Court: Now, that leads us to, you know, we still have an issue of the counterclaim that is before the Court, on, I guess, from 2013 to the present. So, and I think somewhat the issues raised by AMBIT, in its motion for summary judgment would apply. Does someone disagree? Want to go forward with that? I mean, what's your intention, to go forward with your counterclaim?
>
> [Horizon]: Judge, it would be my understanding of the Court's ruling with respect to the counterclaim that this granting of summary judgment would be dispositive of those issues remaining.
>
> The Court: I don't find that. I found the waiver, and they've only waived them up until they stopped paying. So, those matters as to usable fuel and the issues of rent, I think are still pending and before the Court in this litigation.
>
> [Horizon]: Okay. That helps me, Judge. I understand. And with respect to the admissions, do they apply or not apply, and –
>
> The Court: Well, I think that's what we're about to take up with – I mean, we'll take that up with regard to the evidentiary issues.

Despite the business court's hesitancy to accept outright that the 2017 Order encompassed findings as to the admissions that were binding on the parties and its apparent conclusion that the viability of the admissions was still on the table, that question was never revisited

---

[19] Emphasis added.

and no findings were made as to the admissions on the record or otherwise. When we examine side-by-side the business court's orders granting summary judgment to AMBIT and granting summary judgment to Horizon, the importance (and confusion) surrounding the admissions becomes palpable. The admissions are recited in the findings of fact and applied to preclude AMBIT's claims under a waiver analysis,[20] and are referenced as the prejudice in the business court's oral findings relating to laches.[21] But, the admissions are

---

[20] As referenced above, the findings of fact in the order note that "[AMBIT] made the same arguments regarding 'Local Fuel' vers[u]s 'Foreign Fuel' that it asserted in the 2013 litigation and that it is asserting in this litigation despite the admissions made in Section 2a of the May 28, 1996 Agreement and the express agreement to not make such claims after May 28, 1996." The conclusions of law section then finds waiver based on the finding that "the plaintiff was aware that if *all* of the 'Local Fuel' was *exhausted*, it had the right under the November 29, 1989 Amended and Restated Lease Agreement to reduce the percentage upon which monthly rent was calculated and paid to [Horizon]." (Emphasis added). It then concludes that AMBIT "voluntarily relinquished any claim that *useable* [sic] 'Local Fuel' no longer existed from May 28, 1996 up through and including July 29, 2013[,] which is the date of the filing of the counterclaim in the 2013 litigation." (Emphasis added).

[21] The business court's order does not make any findings as to prejudice in its laches analysis. On the record, however, the court asked Horizon what prejudice it suffered, to which Horizon responded:

> Well, Judge, the prejudice is we continue to have this issue. . . . We addressed this issue in 1996 with these admissions, and it just continues to come back. . . . Did – did [AMBIT] act in a certain way and has it acted in a certain way since 1996 up and through December of 2012 in exactly the way that they agreed to operate under [AMBIT's] admissions in the May 28, 1996 agreement. . . .

The business court later made a finding on the record as to prejudice as follows:

> Likewise, the Court would also find that laches would apply in that I don't think waiver requires some prejudice to the defendant, but I do think

21

ignored altogether to preclude Horizon's claims by applying the Lease as the "cookbook" to determine the rent calculation question.

Even if we assume the Lease is the appropriate "cookbook," the appropriate "recipe" is still not apparent. Under the Lease, the parties have assigned two evidently different levels of discretion to AMBIT in making the same determination. Operating and non-operating expenses under the Lease are necessarily two sides of the same coin, and mutually exclusive (a non-operating expense is defined as anything other than an operating expense). Yet the parties have given AMBIT "reasonable judgment" to determine what is an operating reason and "sole judgment" to determine what is a non-operating reason. What level of discretion the parties intended to assign to AMBIT – reasonable or sole judgment – is a question of intent, as is whether that bargained-for judgment means that AMBIT is free to ignore the parameters the Lease sets for determination of operating and non-operating reasons so long as it steers clear of arbitrary and capricious decision-making.[22]

---

laches does, and I think their prejudice would have been the preparation and defense of any issues of what *usable* fuel was present on the leased premises.

(Emphasis added).

[22] Adding another layer of confusion to this quagmire of a contract is the inclusion of a provision for an arbiter to determine operating and non-operating reasons when AMBIT and Horizon disagree. We question the application of this provision in light of the "sole" or "reasonable" discretion afforded to AMBIT under the Lease. Specifically, at what point Horizon was free to "disagree" and invoke the arbiter if an arbitrary and

We have previously discussed that "[c]ontract language usually is considered ambiguous where an agreement's terms are inconsistent on their face or where the phraseology can support reasonable differences of opinion as to the meaning of words employed and obligations undertaken."[23] And,

> "[i]f an inquiring court concludes that an ambiguity exists in a contract, the ultimate resolution of it typically will turn on the parties' intent. Exploring the intent of the contracting parties often, but not always, involves marshaling facts extrinsic to the language of the contract document. When this need arises, these facts together with reasonable inferences extractable therefrom are superimposed on the ambiguous words to reveal the parties' discerned intent."[24]

We have held that "[t]he determination of whether a deed, contract, or other writing is ambiguous and does not clearly express the intention of the parties is a question of law to be determined by the court."[25] But that judgment shifts to the factfinder when the circuit court answers that question in the affirmative:

> If a circuit court finds that a deed, contract, or other writing is ambiguous and does not clearly express the intention of the parties, then the proper interpretation of that ambiguous document, when the facts are in dispute, presents a question of

---

capricious standard is imposed. Neither party put this clause on motion before the circuit court, calling into question whether the contract is even capable of judicial resolution when its terms demand an expert arbiter to resolve the dispute.

[23] *Fraternal Order of Police, Lodge No. 69 v. City of Fairmont*, 196 W. Va. 97, 101, 468 S.E.2d 712, 716 (1996).

[24] *Harrell v. Cain*, 242 W. Va. 194, 204, 832 S.E.2d 120, 130 (2019) (quoting *Fraternal Order of Police*, 196 W. Va. at 101 n.7, 468 S.E.2d at 716 n.7.

[25] *Id.* at Syl. Pt. 3.

fact for the factfinder to resolve after considering all relevant extrinsic evidence.[26]

Here, the circuit court did not expressly address the ambiguity of these documents or whether the intent of the parties was clear. However, as noted above, our 2015 decision in *AMBIT I* specifically stated that the 1996 Settlement Agreement was ambiguous; the 2017 Order also concluded that various provisions of the 1996 Settlement Agreement were ambiguous and convoluted. Given that the admissions from that 1996 Settlement Agreement contain past, present, and future tense verbiage that obscure the prospective nature of those admissions, they are capable of different interpretation, and so are ambiguous, particularly when juxtaposed with Section 14. Indeed, how the admissions interact with the Lease Agreement is dependent on whether the admissions were intended to apply prospectively in the first instance, and, in the second, whether they survive Section 14 of the 1996 Settlement Agreement. Finally, internal inconsistencies in the Lease Agreement as it pertains to the operating/non-operating expenses inquiry and the level of discretion afforded to AMBIT also give rise to a finding that the Lease is ambiguous and that the intent of the parties is not clear.

While the 2017 Order appears to have resolved some issues while creating others, reasonable minds could disagree as to the scope of the 2017 Order and whether it

---

[26] *Id.* at Syl. Pt. 4.

24

did or did not resolve those apparent ambiguities.[27] Despite the complexity of the positions advanced by AMBIT and Horizon, the solution, while perhaps not expedient, is simple. We find that the answer to the ambiguities contained in these various documents is not ours to give, nor is it the business court's to give – the factfinder *must* supply the answers to these questions. There is simply too much ambiguity and too many factual disputes in the Lease Agreement, the 1996 Settlement Agreement, and AMBIT's admissions for this case to be appropriate for summary judgment when viewed through the lens of the 2017 Order and the ostensibly conflicting conclusions reached in the summary judgment orders on appeal to this Court.

The factual disputes that necessarily arise from the interpretation of these various agreements require a jury's resolution. In such a complicated fact and litigation pattern and given the tumultuous history of these parties who are seemingly governed by

---

[27] In this respect, we note that the 2017 Order was a final order not appealed by the parties. Thus, if the 2017 Order *did* resolve any ambiguities in the interplay between the admissions, 1996 Settlement Agreement, or Lease Agreement that should have gone to a jury, the parties have waived any such argument.

In an order entered after the summary judgment orders on appeal, the business court noted that "by and through its prior Orders the rate of rent over time and the practical tools for calculating rent in ar[r]ears and forward were determined as matters of law." AMBIT asserts that this demonstrates a definitive allegiance on behalf of the business court to the finding made in the 2017 Order that paragraph six of the Lease Agreement controls the calculation of rent regardless of the admissions. We disagree; that position ignores that the court was "adopting and incorporating as if fully set forth herein the prior Orders themselves and the findings of fact, conclusions of law delivered by this Court *from March 15, 2019, to the present*[.]" (emphasis added).

25

so many overlapping leases, settlement agreements, court orders, and course of performance findings, we borrow an apropos analogy from the Arkansas Court of Appeals, addressing parties' "labyrinth of claims and counterclaims" that "produced a Gordian knot of epic proportion"[28] reaching to a similar conclusion:

> It is certainly tempting to sever the stranglehold of this Gordian knot in true Alexander the Great form with a swift slash of the summary-judgment word. However, because this case presents many disputed issues of material fact, we must rely on the jury to untangle the knot, one strand at a time.[29]

In the same way, the parties here have unresolved underlying questions of fact material to resolving the ambiguity and relationships between these documents that permeate both AMBIT's and Horizon's claims presented in these appeals, and it matters how those threads are loosed. More to the point of summary judgment entered by a court, it matters by *whom* the threads are loosed. In an intricate, circular argument such as this, each decision reached causes a deviation; a tug that affects other claims in the knot. For that reason, we cannot abide summary judgment to resolve this tangle of claims without first resolving the underlying disputes on which they are premised.

We have long held that "'[a] motion for summary judgment should be granted only when it is clear that there is no genuine issue of fact to be tried and inquiry concerning the facts is not desirable to clarify the application of the law.' Syllabus Point

---

[28] *Mountain Pure, L.L.C. v. Affiliated Foods Southwest, Inc.*, 241 S.W.3d 774, 776, 779 (Ark. Ct. App. 2006).

[29] *Id.* at 779.

3, *Aetna Casualty & Surety Co. v. Federal Insurance Co. of New York*, 148 W. Va. 160, 133 S.E.2d 770 (1963)."[30] We find that as it relates to the relationship of these parties, the inherent ambiguity in these documents that ultimately revert to a question of the intent of the parties in how they were to be bound in the future preclude summary judgment as a tool to dispose of these claims. In reviewing the 2017 Order and the ongoing question of whether or not the admissions have continuing viability, we observe that the interrelation of these various documents that purport to govern the parties is the foundation of the claims of both parties on appeal, and it is impossible to find clear meaning in the circular and imprecise language employed in these agreements so as to warrant an interpretation as a matter of law.

## IV.     CONCLUSION

For the foregoing reasons, we reverse the July 30, 2020 Order Granting AMBIT's Renewed Motion for Summary Judgment and the February 6, 2020 Order Granting, In Part, Horizon's Motion for Summary Judgment, and remand for further proceedings.

Reversed and remanded.

---

[30] Syl. Pt. 1, *Andrick v. Town of Buckhannon*, 187 W. Va. 706, 421 S.E.2d 247 (1992).

27